# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| RYCKMAN CREEK RESOURCES, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 16-10292 (KJC) |
| | ) | Jointly Administered |
| | ) | |
| Distribution International, Inc. D/B/A E.J. Bartells, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 16-51039 (KJC) |
| | ) | D.I. 23 |
| ING Capital, LLC, as agent, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Matrix Service Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 16-51040 (KJC) |
| | ) | D.I. 19, 29 |
| Ryckman Creek Resources, LLC, et al., and ING Capital, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Wholesale Electric Supply Company of Houston, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 16-51041 (KJC) |
| | ) | D.I. 18, 28 |
| Ryckman Creek Resources, LLC, et al., and ING Capital, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

BROCK SERVICES, LLC,                          )
                                              )
            Plaintiff,                        )
                                              )
v.                                            )      Adv. Proc. No. 16-51045 (KJC)
                                              )      D.I. 23, 26
ING CAPITAL, LLC, as Administrative and       )
Collateral Agent, for certain Lenders and other )
Secured Parties under the Second Amended and  )
Restated Credit Agreement, dated 10/31/2014,  )
as amended,                                   )
                                              )
            Defendant.                        )
_____ )

## OPINION[1]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the following motions in connection with the same threshold issues—

whether various creditors (i) hold valid liens (ii) that have not been subordinated or waived by

contract and (iii) can claim priority over liens of prepetition lenders:

1.    Distribution International, Inc. d/b/a E.J. Bartells's ("EJB") Motion for Partial

      Judgment on the Pleadings;[2]

2.    Debtors' motion and Matrix Services Inc.'s ("Matrix") Cross Motion for Partial

      Judgment on the Pleadings;[3]

3.    Debtors' motion and Wholesale Electric Supply Company of Houston, Inc.'s

      ("Wholesale Electric") Cross Motion for Partial Judgment on the Pleadings; and

---

[1] This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (K).
[2] EJB filed its Complaint against ING, and the Debtors successfully intervened as co-defendants with ING Capital LLC ("ING").
[3] The Debtors filed a Motion for Partial Judgment on the Pleadings, and ING filed a joinder to that Motion.

4.      Debtors' motion and Brock Services, LLC's ("Brock") Cross Motion[4] for Partial
Judgment on the Pleadings, and Brock's Motion to Strike Debtors' Affirmative
Defenses.

For the reasons that follow, the Court will deny all of the Motions with one exception—
the Court will grant the Defendants' Motion for Partial Judgment on the Pleadings with respect to
Wholesale Electric.

## I.      FACTUAL BACKGROUND

Ryckman Creek Resources, LLC ("Ryckman") was originally formed to engage in the
acquisition, development, marketing, and operation of an underground natural gas storage facility
(the "Facility"), located in Uinta County, Wyoming. The adversary proceedings initiated by EJB,
Matrix, Wholesale Electric, and Brock (collectively, the "Contractors") arise out of the financing
and construction of the Facility, which originally began in the summer of 2011.

On November 2, 2011, Ryckman entered into a Credit Agreement with the prepetition
lenders (the "Lenders"), including ING Capital LLC, as the administrative agent and collateral
agent ("ING" or the "Agent"). In connection with the Credit Agreement, Ryckman granted liens
and security interests in substantially all of its assets to ING, in its capacity as collateral agent
under the Credit Agreement. The Lenders' liens (the "Prepetition Lender Liens") were granted
pursuant to a Security Agreement and a Mortgage, Security Agreement, Assignment, Financing
Statement and Fixture Filing (the "Mortgage"), which were dated November 2, 2011 and perfected
by November 30, 2011.[5] At that time, construction on the Facility was already in progress.

---

[4] Brock originally filed its Complaint against ING, and the Debtors successfully intervened as co-
defendants with ING. When the Debtors filed a Motion for Partial Judgment on the Pleadings, ING filed a
joinder.

[5] There is no dispute as to the validity of the perfected Prepetition Lender Liens and Mortgage.

On April 20, 2013, the Facility's nitrogen removal unit ("NRU") component, a key piece of equipment at the Facility, failed and ignited a fire, causing damage to the Facility. The Second Amended and Restated Credit Agreement was entered into, in part, to provide additional funding for the Facility.[6]

After the fire, between August 2013 and April 2014, Ryckman commenced further construction, at least in part to rebuild and fix the damage to the Facility. According to the Debtors, the construction included replacing the NRU and significant portions of the plant piping at the Facility, and installing other key components. In connection with the Contractors' work on the Facility, Ryckman entered into written agreements with Matrix, Brock, and Wholesale Electric (the "Matrix Agreement," the "Brock Agreement," and the "Wholesale Electric Agreement," respectively).[7] The liens asserted by the Contractors are in connection with services and materials provided for the construction that took place after the fire on April 20, 2013.

On February 2, 2016, the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. On March 24, 2016, this Court entered a final order in the chapter 11 cases authorizing the Debtors to obtain postpetition financing on a secured, superpriority basis (the "DIP Order").[8] On April 11, 2016, ING filed a proof of claim on behalf of

---

[6] *See* Disclosure Statement, p. 16-17 ("During the spring of 2014, Ryckman Creek engaged both ING and Bear River in discussions about amending the existing credit agreement dated November 2011 to allow for additional indebtedness to be incurred by Ryckman Creek to fund completion of the original construction projects, the rebuilt NRU, and equipment to address the H2S issues in the reservoir. Consequently, Ryckman, ING, and Bear River entered into an Amended and Restated Credit Facility.").

[7] Texas state law governs the Matrix Agreement and the Brock Agreement. Wyoming state law governs the Wholesale Electric Agreement. The Debtors and EJB entered into an oral agreement.

[8] The Debtors stipulated that the Prepetition Lenders are secured by "valid, enforceable, properly perfected, first priority, and unavoidable liens" encumbering substantially all of Ryckman's assets. DIP Order ¶ F.1. Subject to the right to bring a Challenge Action, this stipulation is binding on "the Debtors and all other persons, entities, and/or parties in all circumstances," and "the validity, extent, priority, perfection, enforceability, and non-avoidability" of the Prepetition Lender Liens is not subject to challenge by "the Debtors or any other person, entity, or party." DIP Order ¶ 24.

the Prepetition Lenders. The proof of claim asserts a prepetition secured claim against the Debtors in an amount not less than $335,628,099.66. The Contractors also filed proofs of claims in different amounts for their asserted liens related to unpaid work performed on the Facility.

In early August, 2016, the Contractors each initiated an adversary proceeding (the "Adversary Proceedings") in the Debtors' chapter 11 cases. The Debtors and ING intervened or joined in all Adversary Proceedings in which they were not already a party. The Defendants then filed answers, affirmative defenses, and counterclaims in each Adversary Proceeding. The Debtors filed a Motion for Partial Judgment on the Pleadings against each of the Contractors, except EJB. The Contractors each filed a Motion for Partial Judgment on the Pleadings. In addition, Brock filed a Motion to Strike Affirmative Defenses.

## II.    STANDARD- Rule 12(c) Motion for Partial Judgment On The Pleadings

The parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("FRCP"), made applicable by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure ("FRBP"). When deciding a FRCP 12(c) motion for judgment on the pleadings based on an allegation that the plaintiff has failed to state a claim, the motion "is analyzed under the same standards that apply to a FRCP 12(b)(6) motion."[9] That is, the court must view all facts and inferences drawn from the pleadings in the light most favorable to the non-moving party.[10] The motion can be granted only if no relief could be afforded under any set of facts that could be

---

[9] *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir.2010), *cert. denied*, 131 S.Ct. 995, 178 L.Ed.2d 825 (Jan. 18, 2011).
[10] *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 213, 220 (3d Cir. 2001).

proved.[11] However, the court need not adopt conclusory allegations or statements of law.[12] Judgment on the pleadings will only be granted if it is clearly established that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law.[13]

## III.    DISCUSSION

The Contractors each maintain that they were not paid for work they completed on the Facility. As a result, each Contractor filed a lien with the state of Wyoming, and now each claims it is entitled to a partial judgment under FRCP 12(c), declaring that their respective lien relates back to the beginning of the construction of the Facility in the summer of 2011, pursuant to the Wyoming Lien Law.[17] On the contrary, the Debtors and ING argue that the Contractors' liens are invalid, have been waived or subordinated by contract, and that the liens do not relate back to before the perfection of the Prepetition Lender Liens. In order to grant any of the motions pending before the Court, there must exist no genuine issue of material fact as to: (1) the validity of any contractor's alleged lien;[18] (2) the effect of any applicable subordination clauses entered into by the parties; and/or (3) the issue of priority. With the exception of the Debtors' Motion against Wholesale Electric, the motions for partial judgment on the pleadings ask the Court to look outside the pleadings and resolve facts that are in dispute.

---

[11] *Data Engine Techs. LLC v. Google Inc.,* 2016 WL 5667485, at *1–2 (D. Del. Sept. 29, 2016) (citing *Turbe v. Gov't of the Virgin Islands,* 938 F.2d 427, 428 (3d Cir. 1991)).
[12] *Paoli v. Delaware,* C.A. No. 06–462–GMS, 2007 WL 4437219, at *1 (D. Del. Dec.18, 2007) (citing *In re Gen. Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1125 (D. Del. 1988)).
[13] *Halpert on behalf of AsiaInfo-Linkage, Inc. v. Zhang,* 47 F. Supp. 3d 214, 216 (D. Del. 2014) (citing *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir.1988)).
[17] *See* WYO. STAT. ANN. § 29-1-402(c).
[18] At a hearing that took place on December 15, 2016, Counsel for Wholesale Electric mentioned "we didn't want the Court to consider [the issue of validity of the liens] in our motion…" However, the Court cannot make a declaration related to priority without first addressing whether there is a valid lien.

5

1.    **Validity of the Contractors' Alleged Liens**

   a.  **EJB**

*EJB's Motion*

On October 26, 2016, EJB filed a motion seeking a judgment as a matter of law on Count
II of the Debtors' Counterclaims.[19] In the motion, EJB argues that Count II of the Debtors'
Counterclaims should be dismissed because EJB's lien dates back "prior to the recording of the
Agent's lien in November 2011."[20] However, prior to determining priority of any lien, the Court
must first address the threshold issue of whether EJB holds a valid lien. The Defendants' Counter
Complaint includes the following allegations:

> 30. On March 28, 2016, EJB filed proof of claim number 32 (the "EJB Claim"),
> asserting an alleged secured claim in the amount of $410,284.65, purportedly
> secured by a lien (such lien, a "Wyoming Contractor Lien") arising under Wyo.
> Stat. Ann. § 29-2-101 *et seq.*
>
> 31. The services performed by EJB relating to the EJB Claim were provided in
> connection with the rebuild of the NRU, which by definition could not have begun,
> and did not begin, until after the commencement of the Reconstruction Project.
>
> 36. Pursuant to the Wyoming Contractor Lien Law, EJB was required to send
> Ryckman (i) a preliminary notice of EJB's right to assert a lien within thirty (30)
> days after first providing services or materials to the construction project (a
> "Preliminary Notice") and (ii) a notice of intention to file a lien no later than 20
> days prior to filing a lien statement (a "Notice of Intention").
>
> **37. Ryckman and its affiliated debtors did not receive a Preliminary Notice
> within the thirty (30) day timeframe called for under the Wyoming
> Contractors Lien Law.**
>
> 38. Further, the Preliminary Notice was required to "be in substantially the same
> format and contain the same information as the notice contained in W.S. 29-10-
> 101."

---

[19] EJB MJP Br. at 5. Count II of the Debtors' Counterclaim states, "The Alleged Lien Purportedly
Securing the EJB Claim is Subordinate to the Liens of the Agent and Prepetition Lenders."
[20] EJB MJP Br. at 4.

39. Upon information and belief, though EJB alleges that it sent a Preliminary Notice to Ryckman, the form of Preliminary Notice that EJB allegedly sent to Ryckman did not comply with the requirements set forth in the applicable Wyoming statutes. Upon information and belief, the Agent understands that the materials allegedly sent to Ryckman by EJB were based on a lien claim under Wyo. Stat. Ann. 29-2-111, which was repealed effective July 1, 2011, over four years before EJB's alleged Preliminary Notice was drafted.

40. Upon information and belief, **the form of Preliminary Notice that EJB allegedly provided to Ryckman and its affiliates also does not include notice of "the right of the owner or contractor to obtain a lien waiver upon payment for services or materials," as required by the section 29-2-112 of the Wyoming Contractor Lien Law, nor the telephone number of the subcontractor and the legal description of the property on which the lien may be claimed, as provided by the form of Notice of Intention in Wyoming Contractor Lien Law section 29-10-101.[21]**

As set forth above, the Defendants allege that EJB did not properly file a lien under the Wyoming Contractor Lien Law. The Defendants further allege that EJB was not entitled to file a lien under the Wyoming Contractor Lien Law, as EJB did not take the requisite steps to preserve its lien under the Wyoming Contractor Lien Law.[22] In support of this argument, the Defendants aver that EJB failed to send a preliminary notice of its lien in the format and timeframe required by the Wyoming Oil and Gas ("O&G") Lien Law.

For purposes of deciding EJB's Motion for Judgment of the Pleadings, the Court must view all factual allegations most favorably to the non-moving party— particularly, that EJB failed to file its lien in accordance with applicable law, rendering the lien invalid, as alleged by the Defendants. Absent a determination that EJB has a valid lien, it is inappropriate to consider the priority of such a lien in this context. For these reasons, I deny EJB's motion for judgment on the pleadings.

---

[21] Debtors' Counter Complaint at ¶¶ 30-31, 36-40 (emphasis added).
[22] Count I of ING's Answers and Counterclaims; Count I of the Debtors' Answers and Counterclaims.

### b. Matrix

There are two competing motions before the Court with respect to Matrix, both seeking judgment on the pleadings on the issue of priority. As stated above, a determination of priority is contingent upon the validity of Matrix's alleged O&G lien. I will first address the motion filed by Matrix, then I will address the motion filed by the Debtors, joined by ING.

*Matrix's Motion*

In June of 2014, Ryckman and Matrix entered into an agreement pursuant to which Matrix performed work upon the Facility and furnished material to the Debtors in connection with the Facility. Matrix now asserts a lien against the Debtors for unpaid work completed under the Matrix Agreement.[23] For the purpose of ruling on the motion filed by Matrix, the Court takes the following facts alleged in the Defendants' Counter Complaints to be true:

> 41. The services performed by Matrix that form the basis for the Matrix Claim relate to auxiliary work on the NRU and installation and support of various other components of the Facility.

> 48. As set forth above, none of the services provided by Matrix on the Ryckman Creek Facility constitute services covered by the Wyoming O&G Lien Law. Rather, they all **relate to auxiliary work performed on the NRU and installation and support of various other components of the facility.**[24]

---

[23] Because Matrix's asserted lien was filed in Wyoming, the following Wyoming O&G Lien Law applies, which states in relevant part:

(a) Every person who works upon or furnishes material, whether incorporated into the real property or not, under contract with the owner of any interest in real estate or with an agent, trustee or receiver of an owner has a lien to secure payment for:
    (i) Constructing, altering, digging, drilling, driving, boring, operating, completing or repairing any wells, mines or quarries;
    (ii) Altering, repairing or constructing any oil derrick, oil tank or any pipelines;
    (iii) Transportation and related mileage charges plus interest from the date due;
    (iv) Advertising, selling and preparing for sale;
    (v) Sheriff's fees; and
    (vi) Attorney's fees and other costs of collection.

WYO. STAT. ANN. § 29-3-103(a).
[24] Debtors' Counter Complaint at ¶¶ 41, 48.

The Defendants contend that the services provided by Matrix on the Facility are not services covered by the Wyoming O&G Lien Law. Rather, the services relate to "auxiliary work" performed on the NRU and "installation and support of various other components of the facility." Viewing all facts and inferences drawn from the pleadings in the light most favorable to the non-moving party, there clearly exists a genuine issue of fact with respect to the characterization of the work Matrix performed and whether it is protected under the applicable Wyoming statute. If the work completed by Matrix does not conform to the provisions of the Wyoming O&G Lien Law, then the lien will be deemed invalid. As previously stated, without a determination that Matrix has a valid lien, it is inappropriate to consider the priority of such a lien in this context. For this reason, as well as other reasons explained herein, I will deny the motion filed by Matrix.

*Defendants' Motion*

The following facts are alleged in the Complaint filed by Matrix:

3. Matrix holds a secured claim against the Debtors in an amount not less than $6,654,215.05 (including prejudgment interest at the rate of 7% per year, attorney's fees, and other costs of collection, the "Secured Claim"), which is secured by a valid, enforceable, perfected, first priority, and unavoidable oil and gas lien pursuant to the Revised Wyoming Statutory Lien Act (Wyo. Stat. Ann. §29-1-103 *et seq.*) (the "Oil and Gas Lien") on the Debtors' underground natural gas storage facilities and associated real and personal property in Uinta County, Wyoming (the "Ryckman Creek Facility"). The Oil and Gas Lien attached as a first priority lien to the Ryckman Creek Facility and to the property identified in Matrix's Statement of Lien filed on or about February 24, 2016 with the Uinta County Clerk's office (the "Statement of Lien") (collectively, and together with any other collateral to which the Oil and Gas Lien attached under applicable law, the "Collateral").

4. The Secured Claim and the Oil and Gas Lien were timely and properly asserted through Matrix's proof of claim filed in the above-captioned bankruptcy cases (Claim No. 31) and Matrix's Statement of Lien, which provide further details and documentation evidencing the Secured Claim, the Oil and Gas Lien, and the Collateral. Matrix's proof of claim is attached hereto as Exhibit A and incorporated

herein by reference, and its Statement of Lien is attached to the proof of claim. Both are incorporated herein by reference.[25]

Matrix pleads unequivocal facts alleging that it holds a perfected O&G lien recognized by the state of Wyoming. Within its submissions, Matrix reasons that it performed work involving the construction and alteration of wells and the repair and replacement of thousands of feet of pipeline, all within the meaning of the Wyoming O&G Lien Law, which covers *inter alia*, "constructing, altering,…, or repairing any wells" and "altering, repairing or constructing any … pipelines."[26]

As stated, in making a judgment on the pleadings, the Court may consider only well-pled allegations and may take judicial notice of documents on the record.[27] Although Matrix did not address the intricacies of the Wyoming O&G Lien Law in its Complaint, its well-pled allegations and documents on the record nevertheless allege a valid lien, which means the Court cannot grant the Defendants' Motion for Partial Judgment on the Pleadings on this issue.

### c. Brock

*Brock's Motion*

Brock and Ryckman entered into the Mechanical and Construction Services Agreement dated July 28, 2014 (the "Brock Agreement"). Brock asserts a lien against the Debtors for work

---

[25] Matrix Complaint at ¶¶ 3-4.
[26] WYO. STAT. ANN. § 29-3-103(a)(i) and (ii).
[27] *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, Civ. No. 03-1519, 2012 WL 1680097, at *4 (D. N.J. May 14, 2012) ("the Court is also permitted to take into consideration when deciding a Rule 12(c) motion 'items subject to judicial notice, matters of public record, *orders*, and *items appearing in the record of the case.'"*) (internal citations omitted) (emphasis in original); *Two-Way Media Ltd. v. Comcast Cable Communications*, Nos. 14-1006-RGA, 14-1212-RGA, 2016 WL 4373698, at *1 (D. Del. Aug. 15, 2016) (when deciding a Rule 12(c) motion the "Court may also consider matters of public record and . . . . the Court may take judicial notice of the factual record of a prior proceeding.") (internal citations omitted); *see also In re Soto*, 221 B.R. 343, 347 (Bankr. E.D. Pa. 1998) (explaining court can consider under Fed. R. Civ. P. 12(c) matters which are judicially noticed).

10

completed under the Brock Agreement. Brock argues the lien dates back prior to perfection of the Prepetition Lenders' Mortgage. I will first address the issue of whether Brock holds a valid O&G lien. The following facts are alleged in the ING's Counterclaims:

> 40. None of the services provided by Brock to Ryckman constitute services covered by the Wyoming O&G Lien Law. Rather, **they all relate to construction and insulation services performed by Brock in connection with the rebuild of the NRU.**[28]

Taking all well-pled allegations as true, there exists a genuine issue whether the work Brock performed in connection with the Facility is protected under the applicable Wyoming statute. If the work completed does not conform to the provisions of the Wyoming O&G Lien Law, as alleged, then the lien will be deemed invalid. Clearly, there is a genuine issue of material fact regarding the validity of Brock's lien. I will therefore deny the Motion filed by Brock.

*Defendants' Motion*

The Debtors successfully intervened in this adversary proceeding as Co-Defendant with ING, and filed a Motion for Partial Judgment on the Pleadings, which was joined by ING. Collectively, the Defendants argue that Brock does not hold a valid Wyoming O&G lien, or in the alternative, even if the lien is valid, Brock has agreed to subordinate its lien to the Mortgage held by the Prepetition Lenders. For the purposes of ruling on the Defendants' Motion, the Court takes the following facts alleged in Brock's Complaint to be true.

> 11. By mid-2014, and with construction on the Ryckman Facility still continuing, **Ryckman hired Brock directly to provide various mechanical and construction services and materials at the Ryckman Facility.** Among other things, **Brock provided the supervision, equipment, labor, and materials necessary to install hot and cold insulation, fireproofing, project scaffolding, piping insulation, and other construction facilities and utilities.** Brock provided

---

[28] ING Counter Complaint at ¶ 40 (emphasis added).

these services and materials to Ryckman pursuant to an *Agreement Between Ryckman Creek Resources, LLC and Brock Services, LLC for Mechanical and Construction Services,* dated July 28, 2014 (the "Brock Agreement").

13. **On December 31, 2015, Brock, through its counsel, mailed via United States certified mail, postage prepaid and return receipt requested, a** *Notice of Intention to File Lien* **("Intent Notice") to Ryckman** informing Ryckman that Brock had furnished materials and provided services to the Ryckman Facility that remained unpaid and that Brock intended to file a lien against the Ryckman Facility as permitted under Chapter 29 of the Wyoming Statutes. WYO. STAT. ANN. § 29-3-101 *et seq.* (2016). **Brock also mailed a copy of the Intent Notice to the Agent on the same date.**

14. **On or about January 29, 2016, Brock filed a** *Lien Statement* (the "Brock Lien Statement") with respect to the Ryckman Facility and related real and personal property in Uinta County, Wyoming, pursuant to § 29-3-101 *et seq.* of the Wyoming Statutes. The total principal amount set forth in the Brock Lien Statement was $4,151,987.54, plus pre-judgment interest at a rate of seven percent (7%) per annum and attorneys' fees and costs. By filing the Brock Lien Statement, Brock perfected a lien (the "Brock Lien") against the Property, the Ryckman Facility, and all other collateral to which the Brock Lien could attach under applicable law (collectively, the "Brock Collateral").

15. **On January 29, 2016, Brock, through its counsel, also mailed via United States certified mail, postage prepaid and return receipt requested, a** *Notice of Filing Lien* ("Lien Notice") pursuant to WYO. STAT. § 29-1-312 informing Ryckman of the filing of the Brock Lien Statement and the perfection of the Brock Lien. Brock also mailed a copy of the Lien Notice to the Agent on the same date.

16. The Brock Lien was recorded by the Uinta County Clerk on February 2, 2016 under Doc. No. 1013949, Book 1034, Page Nos. 96 through 217.[29]

Taking all of these facts as true, Brock has adequately alleged that it holds a valid lien against the Debtors, and the Court cannot grant partial judgment in favor of the Defendants on this issue. Since this issue is not dispositive with respect to the Defendants' Motions against Brock and Matrix, the Court will continue its inquiry.

---

[29] Brock Complaint at ¶¶ 11, 13-16 (emphasis added).

2. **Matrix and Brock have not already subordinated or released any valid liens they may have against the property of the Debtors.**

The Defendants further contend that, even if Matrix and Brock hold valid liens against the Debtors' property, Matrix and Brock have already subordinated— or are obligated to subordinate— those liens to the Prepetition Lender Liens.

The interpretation of an unambiguous contract is a question of law, which is reviewed *de novo*.[30] Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable.[31]

Article 8 of the Matrix Agreement and the Brock Agreement are identical and provide as follows:

> Contractor shall cooperate with Owner's efforts in obtaining and maintaining equity and debt financing on non-recourse (or other) basis for the Ryckman Creek Gas Storage Project. Without limitation the generality of the foregoing, Contractor will *at the request of Owner or the Financing Parties:* (a) execute a consent and agreement in the form attached hereto as Appendix P and such other documents (including legal opinions) as Owner or any Financing Party may reasonably request in view of obtaining and maintaining such financing: (b) execute an agreement pursuant to which Contractor agrees to subordinate liens that it may be entitled to under applicable laws to the liens of the Financing Parties; and (c) provide information about Contractor as the Financing Parties may reasonably request. The term "Financing Parties" means any and all lenders, security, note or bond holders, investors, equity providers or other persons providing any construction or long term equity or debt financing, refinancing or recapitalization for the Ryckman Creek Gas Storage Project, their successors and assigns, and any trustees or agents acting on their behalf.[34]

The prefatory phrase "at the request of Owner or the Financing Parties" means that the obligation to subordinate is not self-executing. In other words, the contracts require Ryckman and/or ING to request separately that the contractor execute a separate consent agreement

---

[30] *See MCI Telecomm. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d 647, 650 (Tex. 1999).
[31] *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex. 2000).
[34] Matrix Agreement, Art. 8 (emphasis added); Brock Agreement, Art. 8; (emphasis added).

subordinating its lien rights for the subordination obligation to have an effect. The Defendants do

not allege that either of the contractors have already executed a separate subordination agreement.

Consequently, Matrix and Brock have not already subordinated any lien rights to which they may

be entitled.[35]

### 3. If Matrix and/or Brock hold valid liens, there is a genuine issue of material fact concerning the priority of such liens compared to the Prepetition Lender Liens.

*Applicable Wyoming Law*

Because the alleged liens and security interests of Brock and Matrix were filed with the

Uinta County, Wyoming Clerk, the Court will apply Wyoming state law in its assessment of

priority. Generally, the priority of a lien relates back to "the commencement of any construction

work or repair of the premises or property" and attaches to the improvements made from the

commencement of construction.[36] Therefore, a mechanic's lien (or O&G lien) has priority over

any lender's liens perfected after the commencement of construction.[37]

The Supreme Court of Wyoming noted that the "commencement of any construction work"

set forth in the lien priority statute is the "line of demarcation for establishing the relative priorities

of claimants[.]"[38] In *Thatcher*,[39] the court held that the lien of a subcontractor who began work on

---

[35] The Defendants now request that the Court grant specific performance requiring Matrix and Brock to subordinate any liens they may have against the Debtors. However, since the Debtors failed to request subordination, they are now precluded from demanding such action due to material breach of the contract for failure to pay. *See Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 196 (Tex. 2004) (*per curiam*) (holding when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance).

[36] *See* WYO. STAT. ANN. §29-1-402(c).

[37] *See Schulenberg v. Hayden*, 146 Mo. 583, 48 S.W. 472, 473-75 (1898).

[38] *Michael's Const., Inc. v. Am. Nat. Bank*, 2012 WY 76, ¶ 8, 278 P.3d 701, 705 (Wyo. 2012). It is important to note that cases discussing priority of liens from construction that commenced prior to July 1, 2011 reference Wyo. Stat. Ann. § 29–1–305, which was repealed and was replaced by §29-1-402. However, the relevant language referenced in § 29–1–305 is virtually identical to § 29-1-402. Therefore, the Court will look to these cases for guidance in determining priority.

[39] The *Thatcher* decision also discusses the policy perspectives behind the statute's construction: "It is fundamental that statutes be viewed in the light of the objects and purposes to be accomplished. It is clear to this Court that one of the purposes of the lien statutes is to provide a method by which a subcontractor

14

a project after a mortgage was recorded related back to the commencement of construction by the original contractor. Because construction was commenced prior to the recording of [bank's] mortgage, the subcontractor's lien had priority.[40]

However, once a project is *substantially complete*, any subsequent construction cannot relate back to the prior construction.[41] In other words, lien claimants are not entitled to priority over a mortgagee for any reconstruction work performed after completion of the building and recordation of the mortgage.[42] In *Schulenberg*, a house was partially destroyed by fire, and a contractor was then hired to reconstruct the house.[43] When a mortgage lender sought to foreclose on the property, the contractor argued that it was entitled to a lien with priority over that mortgage lender on account of its work on the reconstruction of the house.[44] The *Schulenberg* court held that the mortgage was entered into prior to the reconstruction project, and therefore, the contractor did not have priority over the mortgage lender.[45] The court stressed that the contractor was on notice

---

can be assured he will receive payment for work and materials furnished on a project." *Thatcher & Sons, Inc. v. Norwest Bank Casper, N.A.*, 750 P.2d 1324, 1327 (Wyo. 1988).

[40] *Thatcher*, 750 P.2d at 1327 ("the import of this subsection is that the priority of a perfected lien relates back and attaches to the improvements made from commencement of the project over any subsequent lien perfected under any other statute.").

[41] *See Frontier Plumbing and Heating Co. v. Fitch*, 480 P.2d 398, 399-400 (Wyo. 1971) (affirming finding that any work performed by a contractor after substantial completion of an original project cannot extend back or be considered part of the original project); *Elliott & Barry Eng'g Co. v. Baker*, 114 S.W. 71, 72 (Mo. Ct. App. 1908) (explaining when repairs are done after a building has been finished and is already encumbered by a deed of trust, the deed of trust "will have the preference, because otherwise the encumbrancer might be deprived . . . of part of the security he counted on"); *see also Manning Const. Co., Inc. v. MCI Partners, LLC*, 419 S.W.3d 134, 138-39 (Mo. Ct. App. 2013) (precluding post-completion work from augmenting and extending any prior lien rights). *Elliott & Barry Eng'g Co.* has been cited with approval by Wyoming courts. *See Prugh v. Imhoff*, 9 P.2d 152, 154-55 (Wyo. 1932) (citing *Elliott & Barry Eng'g Co.*, 114 S.W. at 71-72). Moreover, "Because Wyoming's lien law was modeled after Missouri law, Wyoming courts look to Missouri cases as 'persuasive.'" *In re Groff*, 624 F.2d 133, 134 (10th Cir. 1980) (citing *Arch Sellery, Inc.*, 346 P.2d 1068, 1070 n.4 (Wyo. 1959)); *see Lasich v. Wimpenney*, 278 P.2d 807, 812 (Wyo. 1955) ("Our mechanic's lien law was in large measure taken from that of the State of Missouri.").

[42] *See Schulenberg v. Hayden*, 146 Mo. 583, 48 S.W. 472, 473-75 (1898).

[43] *Id.* at 472.

[44] *Id.* at 472.

[45] *Id.* at 474.

of a prior mortgage on the property and had the ability to protect itself by not taking the risk or working on the project.

The Wyoming Supreme Court has acknowledged that abandonment of an initial construction project may preclude a subsequent project's liens from relating back to the initial project even if mere delay will not preclude relation-back.[46] Missouri cases likewise hold that, when a project has been abandoned, a lien for work done at the same site can relate back only to the start of the subsequent project.[47] However, the court in *Thatcher* declined to hold that, "mere cessation of construction is tantamount to abandonment."[48] The court took the position that "a delay in completion of construction is not fatal to the maintenance of a subcontractor's lien unless the delay is the result of bad faith or the delay is unnecessary."[49]

---

[46] *See Thatcher*, 750 P.2d at 1327-28 (Wyo. 1988) ("[T]he priority of a perfected lien relates back and attaches to the improvements made from commencement of the project over any subsequent lien perfected under any other statute.").

[47] *See, e.g., Midwest Floor Co. v. Miceli Dev. Co.*, 304 S.W.3d 243, 249 (Mo. Ct. App. 2009) ("[W]hen work is abandoned and is later resumed under a new contract between different parties, the new contract will be separate and distinct from the old, and will not have priority over a deed of trust executed before the second contract."); *Schroeter Bros. Hardware Co. v. Croatian ""Sokol" Gymnastic Ass'n*, 332 Mo. 440, 460, 58 S.W.2d 995, 1003 (1932) ("It is true that if work on a building entirely ceases and is abandoned and later is resumed, under a new contract between different parties, it is held that mechanics' liens for the new contract cannot relate back to the time when the building was originally commenced."); *see also Thatcher*, 750 P.2d at 1327; *Maplewood Planing Mill & Stair Co. v. Pennant Constr. Co.*, 344 S.W.2d 629, 632 (Mo. Ct. App. 1961) (noting liens accrue upon abandonment – post-abandonment work that is of the same nature as pre-abandonment work and done at same work site by same party cannot relate back to original contract for lien purposes).

[48] *Thatcher*, 750 P.2d at 1328.

[49] *Id.* (temporary cessation of construction prior to subcontractor's work does not preclude such a relation back) (citing *Sawyer v. Sawyer*, 79 Wyo. 489, 335 P.2d 794 (1959)); *Tottenhoff v. Rocky Mountain Const. Co.*, 609 P.2d 464, 466-67 (Wyo. 1980) (holding that when subsequent work is necessary and integral to the completion of the project, the project is not complete, and the time period for perfection and/or priority is extended). *Tottenhoff* involved a single project – the construction of a roof – which was momentarily held in abeyance because the materials needed to complete the project were unavailable for a short time. *Id.* at 465. The parties in that case stipulated that those materials – roof flashing – "were an integral part of the roofing work," were "contemplated by the contract" with the contractor, and were "required to protect the building" to ensure the roof was watertight. *Id.* at 465-66.

*Priority of Liens*

Brock and Matrix each plead a similar version of the facts relevant to the issue of priority. This is largely due to the fact that their asserted liens (the "O&G Liens") are in connection with work performed at approximately the same time, on the same Facility, and were allegedly perfected close in time. As such, I will address Brock's Motion and Matrix's Motion together.

Brock and Matrix contend that the Mortgage and other Prepetition Liens were recorded on or about November 30, 2011, several months after construction began on the Facility. They maintain that, because the O&G Liens relate back in time to the commencement of construction of the Facility in August 2011, the O&G Liens are senior to, have priority over, and outrank the Mortgage and all other Prepetition Liens of the Agent and Lenders perfected on November 30, 2011. For this argument to succeed, the Court must determine that the construction was not "substantially complete" between the time the construction originally began and when Brock and Matrix began work on the Facility. For this purpose, Brock and Matrix reference the First Day Declaration,[50] which states that the original construction of the Facility was still *continuing* and not yet complete as of the Petition Date.

Conversely, the Defendants' main argument[51] rests on the contention that there is a clear distinction between the construction on the Facility which was *substantially completed* prior to the fire (the "Facility Construction Project") and the construction after the fire (the "Facility Reconstruction Project"). By drawing this distinction, the O&G Liens would relate back only to the beginning of the Facility Reconstruction project, which began well after the Prepetition Lender

---

[50] *Declaration of Robert D. Albergotti, Vice President of Restructuring of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings.*
[51] Similar to the reasoning outlined above, I will not parse out each individual pleading with respect to the Debtors and ING when considering the issue of priority. Instead, I will incorporate all of the Defendants' well-pled allegations in my decision. In doing so, the outcome is the same.

Liens were perfected. Therefore, the Prepetition Lenders claim that their liens have priority over the O&G Liens.[52]

According to the Defendants' pleadings, there was a "period of commercial operations," prior to the failure of the Facility's NRU component and the ignition of fire. Moreover, the Defendants allege that during the time of operation, the Facility "received injections of customer gas and gas purchased by the Company."[53] In contrast, the plaintiffs cite to the First Day Declarations, which state that the Facility received natural gas injections in December 2012, but Ryckman was unable to operate the Facility because of the need to remove nitrogen from the reservoir.[54]

The Defendants further contend that the services performed by the Contractors relating to the Contractors' Claims were provided in connection with the rebuild of the NRU, which "could not have begun, and did not begin, until after the commencement of the Reconstruction Project." It is not disputed that Brock and Matrix began their services after the fire in the Facility. Currently in dispute is whether the Facility was "substantially complete" prior to the services Brock and Matrix rendered. The pleadings simply lack sufficient factual allegations to conclude that the Facility was either incomplete or substantially complete prior to the commencement of work by

---

[52] The Defendants rely heavily on the language in the DIP Order, which was approved by this Court. I do not find the language in the DIP Order to be dispositive. Under the DIP Order, the Debtors stipulate that the Prepetition Lenders are secured by "valid, enforceable, properly perfected, first priority, and unavoidable liens" encumbering substantially all of Ryckman's assets. Counterclaims ¶ 33; *see also* DIP Order ¶ F.1. Subject to the right to bring a Challenge Action, this stipulation is binding on "the Debtors and all other persons, entities, and/or parties in all circumstances," and "the validity, extent, priority, perfection, enforceability, and non-avoidability" of the Prepetition Lender Liens is not subject to challenge by "the Debtors or any other person, entity, or party." Counterclaims ¶ 34; *see also* DIP Order ¶ 24.

[53] On March 8, 2013, Ryckman filed a notice of commencement of service with the Federal Energy Regulatory Commission. However, the Court was not informed as to the significance of this filing.

[54] First-Day Declaration ¶¶ 28-29 & n.15.

Brock and Matrix. As such, there is a genuine issue of material fact regarding the priority of the alleged liens. Therefore, I will deny the Defendants' motions with respect to Brock and Matrix.

### 4. Pursuant to the Wholesale Electric Agreement, Wholesale Electric waived its right to assert a lien.

*Defendants' Motion*

In July 2014, the Debtors and Wholesale Electric entered into the Wholesale Electric Agreement, in which Wholesale Electric agreed to perform services in connection with the Facility. Wholesale Electric asserts that it performed work on the Facility, and that there are unpaid amounts due and owing on account of such work.[55] Wholesale Electric further asserts that it filed a statement of lien with the Uinta County Clerk's office with respect to the Facility.[56] Before the Court are competing Motions for Partial Judgment on the Pleadings.

The Debtors and ING seek a determination that Wholesale Electric's alleged lien was waived by the terms of the Wholesale Electric Agreement.[57] In considering whether Wholesale Electric waived its right to assert a lien pursuant to the Wholesale Electric Agreement, I view all facts and inferences drawn therefrom in a light most favorable to Wholesale Electric. In addition, the Court may consider matters of public record as well as authentic documents upon which the complaint is based if attached to the complaint or as an exhibit to the motion.[58] Therefore, I will also consider the Wholesale Electric Agreement, which consists of a two-page Purchase Order, a six-page Purchase Order Continuation, and a document titled "Waiver and Release of Lien Upon Final Payment" (the "Waiver Acknowledgment"), all attached to the parties' submissions.

---

[55] Wholesale Electric Compl. ¶ 12.
[56] Wholesale Electric Compl. ¶ 3.
[57] The relevant language in the Wholesale Electric Agreement differs from the contract language previously discussed herein.
[58] *See Data Engine Techs. LLC v. Google Inc.*, No. CV 14-1115-LPS, 2016 WL 5667485, at *1–2 (D. Del. Sept. 29, 2016) (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994)).

In Wyoming, interpretation of a contract is a question of law.[59] In construing the contract,

if the words of the contract are clear and unambiguous, the court must give them their plain and

ordinary meaning.[60] Here, the Wholesale Electric Agreement states:

> In the event that performance of any services or the furnishing of products
> under the Purchase Order could serve as the basis or attachment or
> imposition of a lien or encumbrance on the real or personal property of
> Company, to the fullest extent permitted by law, *Vendor waives and
> releases the rights to assert and enforce any such lien*, shall obtain from all
> sub-contractors and suppliers similar waivers and releases, and shall defend,
> indemnify and hold Company harmless from all such liens or claims of liens
> arising under the Purchase Order. Vendor shall bear the risk of loss of all
> materials until delivery of products.[61]

It is clear that the term "Company" in the Wholesale Electric Agreement refers to

Ryckman, and the term "Vendor" refers to Wholesale Electric. Within the Purchase Order

Continuation, Wholesale Electric agreed to "deliver the items to be supplied hereunder free and

clear of all liens, encumbrances and claims of laborers and materialmen. Buyer may withhold

payment pending receipt of evidence in form and substance agreeable to it of the absence of such

liens, claims and encumbrances."[62]

Wholesale Electric argues that the Waiver Acknowledgment, a blank form attached to the

Purchase Order Continuation, modifies the waiver in paragraph 11 of the Wholesale Electric

Agreement, such that paragraph 11 should be read to include an unwritten condition – *i.e.*, that any

---

[59] *See Winter v. Pleasant*, 222 P.3d 828, 834 (Wyo. 2010) (the "interpretation and construction of contracts is a matter of law for the courts.").

[60] *Amoco Production Company v. EM Nominee Partnership Company*, 2 P.3d 534, 539-40 (Wyo. 2000) ("According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate.").

[61] *See* Purchase Order at ¶ 11 (emphasis added).

[62] *See* Purchase Order Continuation at 6.

lien waiver be conditioned upon final payment.[63] I have considered the Waiver Acknowledgment in my decision. However, Wholesale Electric misconstrues the purpose of the Waiver Acknowledgment, that is, to require a lien release "as a condition to making final payments[.]"[64]

Unlike the contract language in both the Matrix Agreement and Brock Agreement discussed above, Wholesale Electric waived and released its right to assert and enforce any lien against the Debtors upon entering into the Wholesale Electric Agreement. The plain language indicates that the waiver is self-executing and there is nothing in Wholesale Electric's pleadings or the contract language to suggest otherwise. [65] Therefore, even if Wholesale Electric has filed a lien, Counts I and II of the Complaint are precluded by the clear and unambiguous terms of the Wholesale Electric Agreement. I will grant the Defendants' Motion for Judgment on the Pleadings with respect to Wholesale Electric and, consequently, deny Wholesale Electric's Motion for Partial Judgment on the Pleadings.

### 5.  Striking the Debtors' Affirmative Defenses is Not Warranted.

In addition to requesting judgment on the pleadings under FRCP 12(c), Brock also asks this Court to strike as "insufficient" the Debtors' and ING's affirmative defenses pursuant to FRCP 12(f) and FRBP 7012(b).[84] FRCP 12(f) states that a court "may strike from a pleading an

---

[63] *See* Wholesale Electric Answering Br. at 6-10. The Waiver Acknowledgment states, in pertinent part, "In consideration of full and final payment made to the undersigned, the undersigned does hereby release and waive any and all liens, lien claims and rights to any liens that now may exist or that could at any time and in any way arise out of labor, equipment, services, materials, work or operations of any kind (including transportation) provided by, through or on behalf of the undersigned in connection with the above referenced purchase order and land referred to in this Waiver and Release, including without limitation any liens, lien claims and rights to any liens that could in any manner affect or encumber the real estate upon which Ryckman Creek's Plant is located or any property and real estate of Ryckman Creek Resources, LLC."

[64] Wholesale Electric Agreement ¶ 13.

[65] *See Claman v. Popp*, 279 P.3d 1003, 1013 (Wyo. 2012) ("'[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them.'") (citation omitted).

[84] *See* FED. R. CIV. P. 12(f); FED. R. BANKR. P. 7012(b).

21

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[85] Pursuant to FRCP 12(f), "a court is not required to accept affirmative defenses that are mere 'bare bones' conclusory allegations" and may strike such inadequately pleaded defenses.[86] To strike such defenses, the movant must demonstrate that the inadequate and/or surplus defenses will prejudice it in the litigation.[87]

Brock requests that this Court strike the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Affirmative Defenses of both the Debtors and ING.[88] For each of these defenses, Brock avers that the Defendants plead the sort of "bare bones conclusory allegations" that should be stricken under FRCP 12(f). Brock states it "has no time to waste conducting discovery on the Debtors' and ING's allegations and defenses, as it might have had were a more leisurely discovery schedule in place." A mere desire for a more leisurely discovery schedule is not the type of prejudice that warrants striking affirmative defenses. As such, I will deny Brock's request to strike Affirmative Defenses Four through Ten in the Debtor Counterclaim and ING Counterclaim, respectively. Appropriate orders follow.


BY THE COURT:


_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated: February 8, 2017

---

[85] FED. R. CIV. P. 12(f).
[86] *Sun Microsystems, Inc. v. Versata Enters., Inc.*, 630 F.Supp.2d 395, 408 (D. Del. 2009) (citing *Cintron Beverage Group, LLC v. DePersia*, No. 07-3043, 2008 WL 1776430, at *2 (E.D. Pa. Apr. 15, 2008)).
[87] *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F.Supp.2d 376, 383- 84 (D. Del. 2012).
[88] ING Counter., D.I. 4, ¶¶ 38-44; Debtor Counter., D.I. 5, ¶¶ 37-43.